IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BSQUARE CORPORATION | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C. A. No. 05-886-JJF |
| | ) | |
| DATA EVOLUTION CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## ANSWER AND COUNTERCLAIM

Defendant Data Evolution Corporation ("Data Evolution") by and through its attorneys answers the Complaint of plaintiff Bsquare Corporation ("Bsquare") as follows:

### I. PARTIES

1.    Data Evolution is without knowledge or information sufficient to form a belief as to the truth of the averment of this paragraph.

2.    Admitted.

### II. VENUE AND JURISDICTION

3.    Admitted that venue and jurisdiction are appropriate in this court.

### III. FACTUAL BACKGROUND

4.    Admit that the parties are parties to a contract that forms the basis of the dispute in this litigation.  Admit generally that Bsquare was to provide certain services to Data Evolution in connection with the development of the next version of the Clio® tablet computer, that is owned and sold by Data Evolution, pursuant to the terms and conditions contained in the contract between the parties.  Data Evolution denies all remaining allegations of paragraph 4.

5.    Deny the allegations of paragraph 5 and refer to the terms of the contract between the parties for the complete terms of the agreement between the parties.

6.    Admit that one of Bsquare's project quotes estimated that its work would cost Data Evolution approximately $330,675.    Admit that Bsquare subsequently increased its estimated cost to complete the required work.    Admit that Bsquare proposed certain Change of Scopes and that the parties agreed to Change of Scope 6 that ultimately increased the projected cost to Data Evolution over the original estimates provided by Bsquare.    The remaining allegations of paragraph 6 are denied.

7.    Admit that Bsquare sent a letter to Data Evolution dated June 9, 2005 in which Bsquare stated, among other things, that it was stopping work on the project.    The remaining allegations of paragraph 7 are denied.

8.    Admit that Data Evolution has refused to pay to Bsquare the amounts it has demanded because such amounts are not due.    The remaining allegations of paragraph 8 are denied.

9.    Admit that the parties engaged in a mediation proceeding that included a mediation conference on October 8, 2005 in Wilmington, Delaware and that the parties have been unable to settle their dispute.    The remaining allegations of paragraph 9 are denied.

### IV.  Breach of Contract

10.    Denied.

### V.  Misappropriation of Intellectual Property

11.    Denied.

12.    Denied.

VI. Prayer

13.     Denied that Bsquare is entitled to any relief and respectfully request that its claims be dismissed with prejudice.

## AFFIRMATIVE DEFENSES

14.     Plaintiff's claims are barred by its material breach of the contracts between Bsquare and Data Evolution.

15.     Plaintiff is barred from the relief it seeks by its unclean hands.

16.     Plaintiff is barred from the relief it seeks by its bad faith in the performance of the contracts between the parties.

17.     Plaintiff's claims are subject to recoupment and set-off rights of Data Evolution.

18.     Plaintiff is barred from the relief it seeks because it would be unjustly enriched as it has failed to deliver anything of value to Data Evolution.

## COUNTERCLAIM

Data Evolution Corporation ("Data Evolution") hereby files this counterclaim against Bsquare Corporation ("Bsquare") and in support thereof states as follows:

**A.     THE PARTIES**

1.     Data Evolution is a Delaware corporation which manufactures, markets and sells computer hardware products that focus on niche markets, such as healthcare, education, data capture and sales automation.  Its primary products are the Clio®, a convertible tablet computer, and the Cathena, a notebook computer.

2.     The Clio, which runs Microsoft's Windows CE® operating system, features an award-winning, patented Swing Top pivoting arm and a 9.4" LCD screen with 180° screen rotation that gives the user the freedom to change configurations as applications dictate.

3.     Originally introduced in 1998, the Clio has won numerous awards, has been featured in hundreds of articles and has appeared on the cover of Business Week and other magazines.  The Cathena has the look and feel of a traditional ultra-light notebook computer while offering features of a high-performance Windows CE product, such as instant-on, no hard drive, extended battery life, and low support costs.

4.     Bsquare is a public company incorporated in the State of Washington.  Bsquare provides software and customized consulting and engineering services to Windows-based smart device makers.  As of February 28, 2005, Bsquare had 110 employees, including 58 employees in professional engineering services.

5.     During the fourth quarter of 2004 and the first quarter of 2005, Bsquare suffered a revenue shortfall as a result of a decline in orders from its largest customer, Cardinal Healthcare, which had provided 19% of Bsquare's revenue in 2004.  On March 4, 2005, Bsquare announced that Cardinal had discontinued its relationship with Bsquare in favor of a competitor.  In a March 3, 2005 earnings conference call, Brian Cowley, Bsquare's CEO, acknowledged that Bsquare had underutilized engineers in its services business, explaining:

> Specifically, for the last several quarters, our service capacity has been underutilized due to lower than expected sales volumes.  As billable hours and revenues increase, there should be little corresponding increase in service costs due to this capacity availability.

Thus, during the first half of 2005, Bsquare was trying to replace the revenue lost from Cardinal and to increase the billable hours for its underutilized engineering staff. As set forth below, it misused the Data Evolution contract to help accomplish that goal.

## B.     BACKGROUND OF THE AGREEMENT

6.     During 2004, Robert Sowah, Chief Executive Officer of Data Evolution, approached Bsquare and requested an estimate for modifying the existing design of the Clio and incorporating that revised design in a clamshell case for the Cathena. The revamping of the Clio from generation 1 to generation 2 would include the addition of features such as a larger screen, new keyboard, new ports, including a USB port, as well as other modifications.

7.     Bsquare's competition for the Data Evolution work, Wistron, proposed a complete end-to-end solution to Data Evolution, including mechanical design, electrical/hardware design software design and prototyping, as well as a source for manufacturing. To compete with Wistron, Bsquare also had to provide a complete solution, including tasks that would be performed by third parties.

8.     To induce Data Evolution to award Bsquare the contract, Bsquare submitted detailed project quotes including the estimated costs and the estimated hours for the different phases of the project. For example, in version #4 of its Project Quote, Bsquare estimated that its work on the project would take 2,754 hours, which at a blended labor rate of $120 per hour would cost Data Evolution $330,675.

9.     While Data Evolution initially hoped to have delivery in 2004, Bsquare could not commit to complete the Clio project until late March/early April primarily because the mother board to be used contained a graphics chip that, by the time the Clio would have come to market, would have been obsolete. By moving the date back, the next generation chip could be

incorporated. Based on Bsquare's estimate and schedule, Data Evolution awarded the contract to Bsquare.

## C.     THE MASTER AGREEMENT

10.     Data Evolution and Bsquare entered into a Master Professional Engineering Services Agreement dated as of January 18, 2005 (the "Agreement"). The Agreement provides in Section 1.3 that Data Evolution is developing a computer device that incorporates Windows CE and is retaining Bsquare to provide certain custom adaptation development services.

11.     Section 3.1.1 of the Agreement provides that Bsquare will furnish Data Evolution with Services substantially in accordance with the Statement of Work and that the parties will use good faith and commercially reasonable efforts to perform the obligations specified in the Statement of Work to enable compliance with the schedule.

12.     Section 4 of the Agreement requires Bsquare to use "good faith and commercially reasonable efforts to deliver the Bsquare Deliverables according to the schedule contained in the Statement of Work."

13.     Section 6 of the Agreement states that "Data Evolution shall pay Bsquare the service compensation described on Exhibit C in accordance with the terms set forth therein." Exhibit C provided that Data Evolution would pay Bsquare on a time and materials basis at a rate of $120 per person per hour.

14.     Exhibit A to the Agreement was the Statement of Work, which "defines the work necessary to deliver a product that meets the Data Evolution Requirements for the Clio V2 device."

15.     The project was divided into four phases: Phase 1: Feasibility and Risk Analysis; Phase 2: Architecture Specification; Phase 3: First Prototype Development; Phase 4: Production

Design Development. The Statement of Work details the specific tasks to be done during each phase. Adjustments by Bsquare and Data Evolution to the Statement of Work were to be done through the use of the Change of Scope ("COS") procedure outlined in the Statement of Work.

16.    Originally the feasibility study period was to take thirty days. At Bsquare's request, that period was extended to 60 days so that Bsquare was sure it understood the scope of the task and the work that would be involved before it provided its time and cost estimates.

17.    Section 5.1.1 provides that Pre-existing Work, which is defined as "computer code or materials developed or otherwise obtained by or for" Data Evolution or its affiliates or Bsquare or its affiliate, shall remain the sole property of the party providing that Pre-existing Work.

18.    Section 5.1.2 provides:

> Upon receipt of full payment of the fees and expenses due hereunder, Bsquare assigns COMPANY joint ownership in all rights in any computer code or materials (other than Pre-existing Work, third party intellectual property and any derivative work thereof, and other than the board design, rights to which are more fully described in Section 5.1.3 below) developed by Bsquare (or in collaboration with COMPANY) and provided to COMPANY in the course of performance of this Agreement (Developments).

19.    Under Section 5.1.3, all rights in the physical layout of the board design that is developed under the Agreement are to be vested solely in Data Evolution, subject to Bsquare's ownership rights in its Pre-existing Work in the Sierra Board. Significantly, neither Section 5.1.1 nor Section 5.1.3 is subject to any requirement of full payment to Bsquare.

20.    Section 5.2 provides that the ownership rights in Section 5.1 are subject to various use rights. Section 5.2.1 gives Bsquare a temporary, non-exclusive license to use Data Evolution's Pre-existing Work while performing Services under the Agreement. It does not give

Bsquare any ownership rights in Data Evolution's Pre-existing Work or any use rights when Bsquare is not performing services under the Agreement.

21.    Section 5.2.1 also provides:

> Upon receipt of full payment of the fees and expenses due hereunder, Bsquare grants COMPANY a non-exclusive perpetual license to use, reproduce and modify any Bsquare Pre-existing Work that may be incorporated as part of the Services delivered to COMPANY hereunder, and to distribute the object code version of such Bsquare Pre-existing Work.

22.    Section 8.1 of the Agreement provides:

> A party shall be in default under this Agreement (a "Default") if such party: (a) materially fails to perform or comply with any provision of this Agreement; …

23.    Section 8.2 grants the non-defaulting party the right to terminate the Agreement upon 30 days' written notice to the defaulting party of breaches of any provision of the Agreement. Termination is effective 30 days after notice if the defaults have not been cured.

## D.    BSQUARE'S UNSATISFACTORY PERFORMANCE

24.    As the project unfolded, it became clear that Bsquare had underestimated the level of effort and skills required and was not managing the project efficiently. This led to repeated and material increases in the cost estimate and multiple extensions of the schedule.

25.    Bsquare designated Carlos Ribas as project manager. It turned out he was not a project manager by profession, but an engineer. Moreover, Mr. Ribas did not live near Bsquare's principal place of business in Bellevue, Washington, but in San José, California. Mr. Ribas purportedly put 383 billable hours into the project before he found another job and disappeared from the project in early February, 2005 without advance notice to Data Evolution.

26.    In early January 2005, Bsquare completed Phase 1 of the project, the feasibility and risk study of critical features (the "Feasibility Study"). Change of Scope ("COS") 1 through

4 in January, 2005 raised the Bsquare labor cost to $385,200, representing 3210 billable hours. On February 14, 2005 Bsquare proposed another $28,880 of additional labor costs. These additions were embodied in COS 5. The additional 174 hours under COS 5 brought the New Project Total for "Bsquare Labor only" to $406,080 for 3,384 hours.

27.    When it tendered its invoice dated February 25 2005, Bsquare had already billed for 1,739.50 hours, totaling $208,740. By March 7, 2005, Bsquare was proposing an additional increase which would bring Bsquare labor to 4,734 hours at a cost of $568,080. This was $237,600 and 1,980 hours over Bsquare's original bid amount; a 72% increase.

28.    Data Evolution was alarmed by Bsquare's inability to produce results at the agreed-upon cost and on the agreed-upon schedule. Mr. Sowah requested a meeting to review the schedule and the budget. The high-level meeting took place at Bsquare on March 15, 2005. During the meeting, Mr. Sowah expressed Data Evolution's dissatisfaction with the increase in budget and push-back of the schedule. Bsquare was by then quoting a completion date of May 13, 2005 for Phase 3 of the Clio only and had increased its estimate of the overall cost of the project to over $1 million.

29.    In a budget chronology prepared for the March 15, 2005 meeting, Bsquare asserted that a total of 4,734 hours would be needed to complete the project, an increase of 1,350 hours over the 3,384 hours reflected in the total Bsquare time under COS 5. However, in support of the purported need for increased hours, Bsquare only cited "892 hours in Change of Scope Activities" and "110 hours misbid"—a total of 1,002. Thus, even under Bsquare's scenario, the hours should only have increased from 3,384 to 4,386, not 4,734, and the cost should have increased to $526,320, not $568,080.

30.     In asserting that still more hours were needed, Bsquare claimed that while the budget assumed 18 hours of project management time per week, the use of significantly more third-party suppliers would necessitate 10 additional engineering manager/project manager ("EM/PM") hours per week.  Bsquare claimed that 420 additional EM/PM hours were necessary.  However, even under Bsquare's ever-longer schedule, the project was not to last an additional 42 weeks.  Bsquare either mistakenly or deliberately overstated the additional hours of project management it claimed would be necessary.

31.     Ultimately it was agreed that COS 6 would be for a maximum of 1,192 hours.  This would increase the number of hours from 3,384 hours under COS 5 to 4,576 hours under COS 6.  This would increase the value of billable hours of Bsquare from $406,080 under COS 5 to $549,120 under COS 6.  However, Bsquare agreed to write down 510 hours so that a maximum of 682 additional hours would be billed to Data Evolution.  Thus, the maximum total hours Data Evolution would pay for was 4,066, which at $120 per hour is a total cost of $487,920.

32.     Mr. Sowah made it clear at the March 15 meeting that Data Evolution did not want any more surprises.  He specifically asked whether Bsquare had accounted for all the work and if there were any additional dollars to be added to the Bsquare portion.  Bsquare assured him that this was everything to completion.  Mr. Sowah stated at the end of the meeting that he expected no additional costs.  Mr. Sowah was adamant that the cost of the Bsquare portion of the project was not to increase.

33.     The agreement reached on March 15, 2005 was reflected in COS 6 dated March 16, 2005.  COS 6 covers "Program management, design validation, upgrade to M-Systems G3 chip and Electrical Tasks."  It provides that:

> The items in this Change of Scope were discussed and agreed to on March 15, 2005. Total hour increase is 1192 hrs. Bsquare has agreed to write down 510 hours. Data Evolution (DE) is responsible for up to 682 hours of this change of scope.

34. Data Evolution specifically changed the proposed wording of COS 6 to indicate plainly that it would pay "up to" 682 additional Bsquare hours for the COS tasks if those hours were necessary. However, if the tasks contemplated by COS 6 were accomplished in less than 682 hours, then Data Evolution would only pay for the lesser number of hours actually needed.

35. COS 6 set the New Project Total for Bsquare at $487,920. In COS 6, Bsquare and Data Evolution agreed on a precise maximum number of additional hours for which Data Evolution would pay (682 hours) in order to have Bsquare complete the project. On page 2 of COS 6, Bsquare acknowledged deficiencies in its performance, including failing to check items during budget preparation and failing to re-budget after the Feasibility Study.

36. Bsquare agreed that it would write off 510 hours: 110 hours for poor bidding and 150 hours poor execution on electrical design tasks, 40 hours for poor execution in locating a keyboard and 210 hours of EM/PM time. The poor bidding and poor execution write offs totaled 300 hours. The EM/PM write-down was the balance of the 510 hours Bsquare had agreed to write off.

37. Despite the agreement at the March 15 meeting, as reflected in COS 6, Bsquare continued to insist that hundreds and then thousands of additional hours were necessary to complete the project and that Data Evolution must pay far beyond the hours it had agreed to pay. In April, 2005, Bsquare increased its cost estimate from $487,920 to over $700,000, an increase of over $350,000 from Bsquare's original estimate and over $200,000 from the price it had agreed to at the March 15 meeting.

38.    In March through May, 2005, Bsquare sent Data Evolution the following invoices for consulting services on the Clio project:

|  |  | Hours | Amount |
|---|---|---|---|
| 3/25/05 |  | 773 | $92,760 |
| 4/29/05 | Clio | 824 | 98,880 |
| 5/13/05 | Clio | 428.25 | 51,390 |
| 5/27/05 | Clio | 491.25 | 58,950 |
|  |  | 2516.5 | $301,980 |

On June 17, 2005, Bsquare invoiced another 351.75 hours ($42,210), bringing the post-March 15 total bills to 2,868.25 and $344,190.

39.    Even deducting the 300 hour ($36,000) write-off for poor bidding and execution and the $960 credit for the 8 hour overcharge, Bsquare had billed 4,533.75 hours and $542,388.75 by June 17, 2005.

40.    And the end was nowhere in sight.  On June 8, 2005, Bsquare provided Data Evolution with an estimate of the additional hours just to complete Phase 3 of the project:

| | |
|---|---|
| Software | 477 |
| Hardware | 874 |
| Project | 104 |
| Total | 1455 |

At $120 per hour, it would cost Data Evolution an additional $174,600—assuming, contrary to prior experience, that Bsquare could actually complete the task and complete it in the number of hours promised.

41.    On June 15, 2005, Bsquare stated that an additional 660 hours would be necessary just to complete the software portion of Phase 4 of the Clio project.

42.    Bsquare's slow performance created serious problems for Data Evolution.  On May 12, 2005, Mr. Sowah informed Bsquare that a representative of Exxon, which was

interested in 14,000 Clios, was "blowing a gasket" because Bsquare had not delivered a breadboard (i.e. development board) as promised.

43.     A Data Evolution OEM customer, who had waited for the Clio for months, finally launched their software package bundled with a competitor's product because they could wait no longer.

44.     The last straw for Data Evolution was when it became apparent that Bsquare's ineptitude and tardiness might prevent Data Evolution from having its prototype new products in time for an important educational trade show in Philadelphia in late June 2005.   This was particularly troubling because this critical trade show was known to Bsquare from the inception of the project and was a major driving force behind the scheduling.

45.     On June 9, 2005, Bsquare sent a Notice of Default claiming that Data Evolution had committed a material breach of the Agreement by not paying $198,567.26 of invoices sent by Bsquare.  Bsquare stated that it was stopping work on the Cathena project effective June 10, 2005 and that "Data Evolution will not be receiving any deliverables from Bsquare in relation to the upcoming trade show that we have discussed."

46.     Data Evolution, with Bsquare's consent and approval, hired A7 Engineering to evaluate the status of the Clio/Cathena project.  Randy Moore, an A7 engineer, traveled to Bsquare on June 29-30, 2005.  Moore was surprised that the hardware platform, instead of appearing ready for delivery within weeks, appeared to be first pass hardware that was not packaged in an enclosure with possible cutouts for debug connectors.

47.     Bsquare claimed the hardware was a first revision, but conceded that there would be at least one more revision and there was a 40% to 60% chance two revisions would be necessary.  Bsquare claimed that the hardware was approximately 50% validated.  A list of tasks

it provided to Moore stated "Hardware Validation—48% complete" and "Hardware Validation Test Plan—56% complete." Mr. Moore's opinion was that the level of validation was not clear and he could not understand how hardware validation could be quantified without having a complete or close-to-completed test plan.

48.    Bsquare produced to Moore a single page of tasks to complete Phase 3. This surprised the A7 engineer because even in a well-managed project that is 80-90% completed, there typically would be multiple pages with detailed descriptions of specific tasks. He was surprised by the lack of details and the low level of breakdown for the tasks. The project schedule Bsquare presented to Mr. Moore was also deficient because it lacked detailed task descriptions, items for some of open issues and testing items. A7 also identified numerous other problematic issues in its review.

49.    Mr. Moore concluded that Bsquare's estimation effort and tracking was poor and that  Bsquare had done a poor job of setting expectations and clarifying risk. Bsquare had misevaluated the project as merely tweaking a working design. A7 concluded that Bsquare's work was so internalized and individualized that Data Evolution could not successfully have another firm complete the project.

50.    On July 8, 2005, Bsquare sent a Second Notice of Default claiming that Data Evolution owed an additional $383,235.40 beyond the $198,567.26 previously demanded. Of course, Bsquare's demand for payment of nearly $600,000 beyond the almost $300,000 Data Evolution had already paid would mean the project, which was no where near completed, would cost several times what Bsquare had represented it would.

51.    On July 14, 2005, Data Evolution responded to Bsquare's purported default notices. The July 14, 2005 letter notified Bsquare that, because of Bsquare's cessation of work,

and its complete inability to meet its stated obligations, budgetary constraints and deadlines, Bsquare was in default of the terms and conditions of the Agreement. The letter noted that Bsquare's performance had been chronically over budget and over time in all phases and noted that Bsquare's last estimate in June 2005 would put the cost of the project and time completion at almost three times Bsquare's original estimates. The letter repeated Data Evolution's request that Bsquare provide copies of original timesheets supporting the amounts Bsquare had invoiced, including full descriptions of the work performed, the date it was performed, the time spent and the identify of the timekeeper.

52.    On July 15, 2005, Bsquare sent a Notice of Termination. Bsquare claimed that in providing services to Data Evolution intellectual property had been generated that is "very valuable to Bsquare" and claimed that all such intellectual property was owned exclusively by Bsquare and that Data Evolution had no rights whatsoever in this intellectual property. Bsquare demanded that Data Evolution:

1.    Terminate any and all of Data Evolution's use of any intellectual property developed for or provided to Data Evolution by Bsquare or its suppliers under the Agreement ("Bsquare IP");

2.    Terminate all use of any item, tool, component, etc. that was developed and or modified for Data Evolution and which used any Bsquare IP;

3.    Notify all of its vendors to stop all use of any Bsquare IP; and

4.    Return to Bsquare all Bsquare IP that Data Evolution or its vendors have, including, but not limited to, the following:

a.    All Bsquare Pre-existing Work (defined in the Agreement as code or materials developed or otherwise obtained by or for Bsquare or its affiliates independently of the Agreement);

b.    All Bsquare developments (defined in the Agreement as computer code or materials, other than Pre-existing Work, third party intellectual property and any derivative work thereof, and other than the board design (the current rights to which are subject to interpretation under the Agreement), developed by Bsquare in collaboration with Data Evolution and

provided to Data Evolution in the course of performance of the Agreement);

      c.    <u>All intellectual property developed by Bsquare's suppliers</u>, who include, but are not limited to, Synapse Strategic Development, LLC, Rosslare American, Inc. and its subsidiaries, American Panel Corporation, Fujitsu, Flex Interconnect Technologies, Arrk Product Development Group, Safety Engineering Laboratory and West Coast Design. (Emphasis added.)

53.    Paragraph 4a of the letter appears to reflect Bsquare's overbroad interpretation of Section 5.1.1 of the Agreement. Paragraph 4b is apparently Bsquare's overbroad interpretation of Section 5.1.2 (including a transparent attempt to make Data Evolution's plain and exclusive right under Section 5.1.3 to the board design "subject to interpretation under the Agreement"). The assertion in paragraphs 1 and 4c that intellectual property developed by Bsquare's suppliers constitutes Bsquare IP has no basis in, and is contrary to, the provisions of the Agreement. Similarly, there is no basis in the Agreement for Bsquare's claim that Data Evolution may not use any item, tool, component, etc. that was developed and/or modified for Data Evolution and which used any Bsquare IP

54.    In a two-page, 16 item chart, Bsquare's letter claimed the Bsquare IP included "<u>but is not limited to</u>" work done by 11 suppliers and vendors. After the first 15 items claim ownership of virtually everything Bsquare touched, item 16 claims as Bsquare IP "Miscellaneous," which it describes as including:

      Any and all other:
- Supplier lists
- Components lists
- Mock-ups
- Test scripts
- Documentation
- Purposefully or intentionally retained know-how.

Thus, Bsquare claims as its property various lists, unidentified documents and unspecified know-how that 11 suppliers "potentially" have.

55.     The letter admitted that Bsquare had contacted Data Evolution's suppliers "to put them on notice that they are to stop all use of any Bsquare IP that they may have in their possession and that they are to return all such IP to Bsquare immediately." Bsquare then threatened Data Evolution with litigation.

56.     Bsquare also sent threatening letters to numerous suppliers, some of whom were suppliers to Data Evolution before its involvement with Bsquare or were suppliers located by Data Evolution to work on the project. Bsquare's letters noted prior phone discussions with the suppliers concerning Bsquare's dispute with Data Evolution regarding the Clio NXT and Cathena Projects. The letters assert that the suppliers "may possess intellectual property relating to these projects that is exclusively owned by Bsquare ("Bsquare IP")." Bsquare misstates the terms of the Agreement, claiming that:

> Under the written agreement between Bsquare and Data Evolution, Data Evolution currently has no right to use the Bsquare IP or to provide the Bsquare IP to others to use.

57.     The letters threaten that "pending resolution of the dispute between Bsquare and Data Evolution, you have no right to use the Bsquare IP." Bsquare directs the suppliers to:

- Stop all uses of the Bsquare IP;
- Stop all use of any items (including tooling) that were developed or modified using any Bsquare IP, and refrain from transferring such to any party without express written consent of Bsquare; and
- Return all Bsquare IP in your possession to Bsquare.

58.     Bsquare provided to Data Evolution on September 23, 2005, a so-called "bTime Report" that, according to a letter from Bsquare's counsel, is purportedly taken "directly from

Bsquare's time tracking system." Significantly, the letter states that "[t]he time was entered each week by each Bsquare timekeeper." Thus, it appears there were no daily timesheets of activities but that at the end of the work week, each timekeeper simply entered the number of hours he or she claimed to have worked on a given project. Of course, underutilized engineers would have every incentive to be generous in giving their end-of-week estimate of hours. Indeed, virtually all the figures on the report are whole hours, and there are numerous entries for "40" hours where a given engineer (e.g. Carlos Ribas, David Cagle, Chris Neugerbauer, Chris Walsh, Eric Black, Kim Mui) apparently claims to have worked every minute of every hour of every workday on the Data Evolution project.

59.     Counsel's letter claims that the enclosed "Detailed Task Resource Break-down by Week" is "a more detailed version" of the bTime Report. However, the bTime Report contains no information on the specific tasks performed. The breakdown appears to have been created after the fact. There is no showing that the tasks performed on a given day were contemporaneously recorded. Again, virtually all the entries are whole numbers and many of them are very round numbers. In short, the breakdown does not have the look or feel of a contemporaneous recording of time and tasks. Importantly, Bsquare has never provided to Data Evolution any timesheets of individual timekeepers though Data Evolution, beginning in early 2005, repeatedly requested that back-up.

60.     The bTime Report reflects a total of 4,876 hours Bsquare claims to have spent on the Data Evolution project, including 2,514.25 hours after the week of March 13-18,2005 (i.e. after the March 15 meeting and COS 6). Yet Bsquare never completed the project and claimed that thousands of additional hours would be necessary to complete it.

61.     Data Evolution has been significantly damaged by Bsquare's conduct.  All the work the Bsquare has done to date is of no value to Data Evolution.  In effect, Data Evolution must start from ground zero in order to complete the work that Bsquare was hired to perform.  As a result all amounts paid to Bsquare, which to date are approximately $287,000, constitute direct damages recoverable by Data Evolution.

62.     As set forth above, Data Evolution lost an OEM contract.  It also has had to delay and is at risk to lose a contract with Exxon because of the delays occasioned by Bsquare's conduct.  Bsquare is liable to Data Evolution for all lost profits that otherwise could have been earned under those prospective contracts.

63.     Data Evolution projected that it could sell 50,000 units per year once manufacturing had begun.  Each unit was projected to generate approximately $200 in profit.  Thus, Data Evolution has lost and continues to lose over $800,000 per month in every month that its product launch is delayed.  Bsquare is liable for all such lost profits.

64.     Data Evolution also paid $200,000 to a third party who was to serve originally as a manufacturer, and subsequently agreed to provide design services.  Because of Bsquare's conduct that third party has refused to provide those services to Data Evolution requiring Data Evolution to seek out an alternative.  The amounts paid to that third party constitute damages to Data Evolution resulting from Bsquare's actions.

65.     Furthermore, Data Evolution has suffered serious damage to its goodwill as a result of the delays and disruptions caused by Bsquare's actions.  By was of example, on June 9, 2005 (the date on which Bsquare sent notice that it was discontinuing work) Data Evolution's stock, which trades over the counter, closed at $1.20 per share.  From that date forward, its stock price slowly and steadily declined until by January of 2206 it was trading in the mid $0.20 per

share range -- an 83% decline.  That decline equates to a drop in Data Evolution's market capitalization of approximately $20 million.  Bsquare is liable to Data Evolution for any loss to the value of its business occasioned by the loss of goodwill resulting from the delays and disruptions caused by Bsquare's wrongful conduct.

## COUNT I

## BREACH OF THE MASTER AGREEMENT

66.    Data Evolution repeats the allegations of the foregoing paragraphs as if set forth herein.

67.    Data Evolution relied on Bsquare's claimed competence to perform the software and hardware development and other tasks necessary for the project.  It turned out that Bsquare did not have the competence it promised.  It did not have the skill set to do the hardware development.  Bsquare expected Data Evolution to pay for Bsquare to get up the learning curve in order to develop the competence to perform the contract.  However, Data Evolution was not paying Bsquare to give "on the job training" to Carlos Ribas and others.  Bsquare certainly did not have the capability of performing the contract for anywhere near the amount it estimated to get the contract.

68.    Bsquare breached the Agreement through its repeated failure to perform its obligations in a timely and competent manner.  Bsquare materially failed to perform its obligations pursuant to the Agreement.  Bsquare did not, as required by Section 3.1.1 of the Agreement, provide Data Evolution with services that were substantially in accordance with the Statement of Work as modified by the Changes of Scope.  Bsquare also failed to perform its obligations in a manner that enabled compliance with the established schedule.

69.    Bsquare never produced what it promised and failed to meet the schedule for performance again and again.  Because Bsquare's work was incomplete and inadequate, what it did produce was and is of little or no value to Data Evolution.  Bsquare only completed phase 1 and produced few deliverables through its partial efforts on Phases 2, 3 and 4.  This was not a piecemeal project but an integrated project where successful completion of all phases was

necessary to produce a viable product for Data Evolution. Data Evolution's contracts with Exxon and others have been jeopardized because of Bsquare's lack of performance.

70.    Bsquare also breached its obligation of good faith and fair dealing under the agreement by, among other things, misrepresenting its capabilities and competence to perform its obligations under the contract and its invoicing of Data Evolution for hours that were inflated and/or unnecessary.

**COUNT II**

**BREACH OF THE MARCH 15, 2005 AGREEMENT AND COS 6**

71.    Data Evolution repeats the allegations of the foregoing paragraphs as if set forth herein.

72.    Bsquare did not honor its agreement to write off 510 hours, as reflected in COS 6. On March 25, 2005, Bsquare did provide a $36,000 credit for 300 hours. This apparently represented the missed bid (110 hours) and poor execution (190 hours) Bsquare had acknowledged. However, Bsquare never wrote off 210 hours of EM/PM as it specifically agreed to do in COS 6.

73.    In COS 6, Bsquare asserted that for the remainder of the project an additional 10 hours per week of project management would be needed in addition to the 18 hours per week assumed in the budget. Bsquare's bTime Report shows Michael Kahn billed 202 hours for project management from March 20 to June 3, 2005, an average of 18.36 hours per week. Tim Harrington billed 54 hours for project management in that period, an average of 4.9 hours per week. Bsquare recorded only approximately 23 hours per week (not 28 hours) for project management and apparently billed all of it to Data Evolution. In COS 6, Data Evolution agreed it would pay for up to 682 additional hours if needed to COS 6 tasks, including up to 210 additional hours beyond the 18 hours per week budgeted for project management.

74.    Through June 3, 2005, Bsquare had recorded only 56 hours of project management beyond the budgeted 18 hours per week.  Even including 11.5 hours from the week of June 5 2005 (when the "project management" was probably directed in large part to terminating the project), Data Evolution could only be required to pay 67.5 additional hours for additional project management under COS 6.  Therefore, the maximum hours and amount Data Evolution could have been obligated to pay as of the time Bsquare terminated was 3,923.5 hours (i.e. 4,066 – 142.5) and $470,820 ($487,920-$17,100)—if Bsquare had finished the project.  Yet, through its June 17, 2005 invoice, Bsquare had already billed for 4,553.75 hours and $542,388.75.  Of course, Bsquare was a long way from finishing the project (at least 1,455 hours and an additional $174,600 according to its June 8, 2005 estimate).  Therefore, Bsquare plainly breached the Agreement by charging Data Evolution far in excess of the agreed-upon hours and amount.

## COUNT III

## TORTIOUS INTERFERENCE IN DATA EVOLUTION'S BUSINESS

75.    Data Evolution incorporates the allegations of the foregoing paragraphs herein by reference.

76.    Bsquare has breached several provisions of Section 5 of the Agreement by claiming exclusive ownership of the board design, Pre-existing Work of Data Evolution and its affiliates, third-party intellectual property and worked derived from such Pre-existing Work and intellectual property.  Its conduct towards third party suppliers to Data Evolution also constitutes bad faith tortious interference with Data Evolution's business and business relationships.

77.    Under the Agreement, Bsquare has no rights in:

(a)     Pre-existing Work, which includes any materials that were developed or otherwise obtained by or for Data Evolution or its affiliates.  Agt. §§5.1.1, 5.1.2, 5.2.1.

(b)     materials that are derived from Data Evolution's Pre-existing Work.  Id. §§5.1.2, 5.2.1.

(c)     third-party intellectual property and work that is derived from third-party intellectual property.  Id. §5.1.2.

(d)     materials that were not developed by Bsquare or in collaboration with Data Evolution, such as materials developed by third parties or in collaboration with third parties.  Id.

(e)     the board design developed under the Agreement (subject to Bsquare's ownership of Pre-existing Work in the Sierra board).  Id. §5.1.3.

78.     The items identified as Bsquare IP in Bsquare's July 15, 2005 letter and the letters to suppliers indicate that Bsquare is claiming exclusive ownership of, and the ability to preclude use of, information, material and documents that do not belong to Bsquare under the Agreement.

79.     Bsquare's July 15, 2005 letter and its letters to the suppliers admit that most of the information and material Bsquare claims as its intellectual property is in the possession of the third-party suppliers.  Indeed, most of it is information generated by and/or material produced by these third parties.

80.     Bsquare claims in its July 15, 2005 letter that "intellectual property developed or provided to Data Evolution" by suppliers constitutes "Bsquare I.P."  It further claims that Bsquare I.P. includes "[a]ll intellectual property developed by Bsquare's suppliers."  Bsquare's July 15, 2005 letter and its letters to suppliers insist that Data Evolution and the suppliers cease

using Bsquare I.P. and return the Bsquare I.P. to Bsquare. Because Bsquare claims that all intellectual property developed by the suppliers constitutes intellectual property of Bsquare, it is asserting that third-party suppliers cannot use their own intellectual property and must turn that intellectual property over to Bsquare. This proposition is not only absurd, it is directly contrary to the plain terms of the Agreement.

81.     Section 5.1.2 entitles Data Evolution to joint ownership of computer code or materials "developed by Bsquare (or in collaboration with COMPANY) and provided to Company in the course of performance of this Agreement ("Developments")." "Developments" does not include materials produced by third-party suppliers and certainly does not include third-party intellectual property. Indeed, Section 5.1.2 specifically carves out "third-party intellectual property and any derivative work thereof." The Agreement correctly recognized that Bsquare could not assign to Data Evolution joint ownership of third-party intellectual property or any work derived therefrom for the simple reason that Bsquare does not have any ownership rights in such materials. Significantly, neither Bsquare's July 15 letter, nor its letters to suppliers, identifies any agreement by the third-party suppliers that their work (much less their intellectual property) belongs to Bsquare. Bsquare's assertion of ownership rights in third-party intellectual property and work derived therefrom constitutes a material breach of Section 5.1.2 of the Agreement.

82.     Many of the 16 items Bsquare claims to own in its July 15, 2005 letter are materials and information generated by third-party suppliers, not Bsquare. For example, in items 7 and 9 of its laundry list of Bsquare I.P., Bsquare claims that the inverter specification and custom touch-panel mechanical and assembly drawings in the possession of American Panel Corporation ("APC") belong to Bsquare. Bsquare's letter to APC claims as Bsquare IP:

- APC drawings derived from the Bsquare inverter specification.
- APC drawings delivered from Synapse Mechanical Drawings for the custom touch panel assembly and the Clio NXT custom invertor.

Thus, Bsquare is claiming to be the exclusive owner of drawings that were done by APC and even APC drawings delivered from drawings by Synapse. Moreover, COS 5 describes Bsquare's role in the inverter as "LCD + Inverter admin." In other words, Bsquare was functioning in an administrative capacity.

83.    Bsquare also claims a battery specification for a three cell Moli Energy Lithium Ion smart battery pack is Bsquare I.P. Data Evolution is hardly precluded from using cells manufactured by Moli, which is a battery cell manufacturer. The Purchase Request Bsquare submitted for Rosslare stated that:

> Rosslare America will design and supply the CLIO NXT battery pack, including battery cells, circuit board and mechanics.

Thus, the battery pack was designed and produced by Rosslare, not Bsquare. Moreover, the Purchase Request explains that the development expenses covered by the Purchase Request are the "cost of prototypes." It contains no indication that Bsquare will be the exclusive owner of any of Rosslare's work. In fact, Bsquare had no relationship with Rosslare. Rosslare was under contract with Data Evolution and Data Evolution paid Rosslare directly for its work. The parties never intended that Bsquare would have any right to Rosslare's work.

84.    Bsquare also claims that Data Evolution has no ownership rights or right to use (i) any intellectual property developed for or provided to Data Evolution by Bsquare, (ii) any item, tool, component, etc. that was developed and/or modified for Data Evolution and which used any Bsquare I.P. and (iii) all Bsquare Developments. Once again, Bsquare has breached the Agreement by asserting ownership rights and rights to restrict use in violation of the plain terms

of the Agreement. Section 5.1.1 of the Agreement provides that all rights in any computer code or materials developed or otherwise obtained by or for Data Evolution or its affiliates independently of the Agreement constitutes "Pre-existing Work that shall remain the sole property of Data Evolution." Thus, for example, the elements and components of the existing Clio constitute Pre-existing Work of Data Evolution which it and/or its affiliates owned. Furthermore, under Section 5.1.2, Pre-existing Work and any derivative work thereof are explicitly excluded from the definition of Bsquare Developments.

85.     The flex cable to which item 4 of Bsquare's claimed I.P. relates was based on the original flex cable design supplied by Data Evolution. Thus, the changes to the cable are derivative work based on Pre-existing Work of Data Evolution and third-party intellectual property and derivative work. On April 21, 2005, Data Evolution authorized a Purchase Request for Flex Interconnect Technologies to produce 20 flex cables for $1,800 plus $1,000 for tooling and test. Notwithstanding these facts, Bsquare claims it owns the cables Flex produced.

86.     In item 8 of its I.P. claims, Bsquare asserts that tooling documentation related to modifications to the molds and other tooling used for manufacturing the Clio plastic components is owned by Bsquare. The molds are Pre-existing Work of Data Evolution and its affiliates. Any documents showing changes, modifications or additions to support the Data Evolution molds are derived from Data Evolution Pre-existing Work and do not belong to Bsquare. Bsquare's letter to Cascade Quality Molding claims that Bsquare is the exclusive owner and has the sole right to use:

> Clio NXT Mechanical Tooling Files modified or produced by Synapse.

Thus, Bsquare claims to be the exclusive owner of material produced by Synapse, not Bsquare, that was a derivation of Data Evolution's Pre-existing Work.

87.    The Clio Architecture Specification, (item 11) and Clio NXT Specification (item 12) were based on information Data Evolution gave Bsquare through e-mails, files, phone calls and face-to-face meetings.  These items are derived from Pre-existing Work of Data Evolution, including the original specs for the Clio NXT, which were sent to Bsquare in June, 2004.

88.    In item 13 of its list of Bsquare I.P., Bsquare claims to own "Mechanical Design Assets," including a database of Pro/E CAD models, solid model parts and assemblies, PCB mechanical outlines and the database of battery housing developed in cooperation with the battery manufacturer Rosslare.  These materials were developed based on Pre-existing Work supplied by Data Evolution in the form of files, drawings, etc.

89.    Bsquare item 14 claims ownership of Clio and Cathena prototypes for demonstration and/or development uses.  A majority of the components for the prototypes were supplied by Data Evolution.  Moreover, the prototypes are a derivative of the original Clio units, which are Pre-existing Work of Data Evolution.

90.    Bsquare compounds its breach of the Agreement by specifically claiming in the first several items of its 16-item list of claimed Bsquare I.P. that it has ownership rights in the physical design of the board.  It further breached the Agreement by claiming in its July 19, 2005 letter to BreconRidge that the main board design was "exclusively owned by Bsquare."  Section 5.1.3 gives Data Evolution sole rights in the layout of the board design developed under the Agreement, subject only to Bsquare's rights in the Sierra board.

91.    The first two categories of purported Bsquare I.P. are the main board's schematics, board files and physical design of the Clio and Cathena.  The physical layout of the Clio main board is based on Data Evolution supplied files.  Those original files, Gerbers and assembly information also included information such as keyboard, flex cable, battery, I/O ports,

PMCIA circuits, etc. While certain ports were moved or added, this was a modification of the original Data Evolution board. Given Data Evolution's sole ownership of the physical layout of the board design under §5.1.3 and ownership rights in Pre-existing Work and work derived therefrom, Bsquare does not own the board schematics, board files and physical design information it claims to own in its July 15, 2005 letter and July 19, 2005 letter to BreconRidge.

92. According to a February 2, 2005 e-mail from Bsquare and an accompanying Purchase Request, West Coast Design was to provide "PC board layout services," which were to include LED flex designs. Despite Data Evolution's plain right under Section 5.1.3 to the layout work performed by West Coast, Bsquare claimed in item 5 of its July 15, 2005 letter that the "LED flex schematic and layout" done by West Coast is "Bsquare IP."

93. Bsquare's purpose in attacking Data Evolution's past and prospective suppliers is plain—to prevent Data Evolution from developing its products. Basically, Bsquare claims that if it had any contact with a third-party supplier, that anything and everything produced by that supplier belongs exclusively to Bsquare.

94. Bsquare plainly knew that Data Evolution had a business expectancy of using the suppliers to provide components and related services for the development of the Clio and the Cathena. Bsquare intentionally sought to terminate those relationships by improperly threatening that the suppliers would violate Bsquare's intellectual property rights. Bsquare's threats caused Rosslare, Data Evolution's battery manufacturer, to be unwilling to work with Data Evolution. Those threats have also made it more difficult for Data Evolution to work with other suppliers.

95. Through its conduct Bsquare has tortiously interfered in Data Evolution's business.

## COUNT IV

## FRAUD IN THE INDUCEMENT

96.    Data Evolution incorporates the allegations of the foregoing paragraphs herein by reference.

97.    As set forth above, Bsquare misrepresented its competence to complete the project in accordance with the terms of the Agreement.

98.    Bsquare further misrepresented the time and cost required for it to complete the project.  Given the level of the overruns in costs, Bsquare's representations cannot be attributed to simple mistake or miscalculation.  Bsquare either knew that it was underestimating the time and cost to complete the project in order to obtain the contract, or Bsquare should have known or was grossly negligent in not knowing that it could not complete the contract as represented to Data Evolution.

99.    In reliance on these misrepresentations, Data Evolution entered into the agreement with Bsquare.

100.    Data Evolution has been damaged by its reliance on Bsquare's representation by the loss of prospective contracts and having incurred numerous unnecessary and wasteful expenses, including all the amounts paid to Bsquare.

WHEREFORE , Data Evolution requests that an order and judgment be entered against Bsquare granting the following relief:

> (1)    Declaring that Bsquare breached its contracts with Data Evolution and that Data Evolution has no further obligations under the contracts;

> (2)    Ordering Bsquare to provide to Data Evolution all work product it has created in connection with the project;

(3)    Enjoining Bsquare from interfering with Data Evolution's business, including making any representation that it has rights to any of the relevant intellectual property belonging to Data Evolution;

(4)    Awarding to Data Evolution damages as a result of Bsquare's wrongful conduct, including a refund of all amounts paid by Data Evolution to Bsquare; Data Evolution's lost profits occasioned by the delay in launching Data Evolution's products; all additional costs incurred by Data Evolution to complete the work that was to have been performed by Bsquare; and any reduction in the value of Data Evolution's good will.

(5)    Awarding Data Evolution its attorneys fees and costs of this suit because of Bsquare's bad faith conduct; and

(6)    Awarding such other relief as the Court deems just and proper.


PRICKETT, JONES & ELLIOTT, P.A.


By: _____
Michael Hanrahan (Bar ID #941)
Bruce E. Jameson (Bar ID #2931)
J. Clayton Athey (Bar ID #4378)
1310 N. King Street
P. O. Box 1328
Wilmington, DE 19899-1328
(302) 888-6500
*Attorneys for Defendant*
*Data Evolution Corporation*

Dated:  January 27, 2006

## <u>CERTIFICATE OF SERVICE</u>

I, Bruce E. Jameson, hereby certify that on this 27th day of January, 2006, I caused a

copy of the foregoing  **Answer and Counterclaim** to be served via CM/ECF electronic filing

upon the following counsel of record:

> Jonathan L. Parshall, Esquire
> Murphy, Spadaro & Landon
> 1011 Centre Road, Suite 210\
> Wilmington, DE 19805

_____

Bruce E. Jameson (Bar I.D. #2931)